

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION
## IN ADMIRALTY

AMERICAN PRESIDENT LINES, LTD.

    Plaintiff,

vs.                                                Case No.: 3:00-cv-444-J-21B
                                                Division:

FLORACHEM CORPORATION

    Defendant.

_____/

## COMPLAINT

COMES NOW the Plaintiff, AMERICAN PRESIDENT LINES, LTD., by and through its undersigned attorneys, and sues the Defendant, FLORACHEM CORPORATION, and alleges:

1. This is an admiralty or maritime claim within the meaning of Rule 9(h) and this Court has jurisdiction pursuant to 28 U.S.C. § 1333(1) and Article III Section 2 of the United States Constitution.

2. At all material times, AMERICAN PRESIDENT LINES, LTD., was a corporation registered to do business in the state of California, and engaged in the business of common carriage of merchandise by water for hire.

3. At all material times, FLORACHEM CORPORATION was a corporation registered to do business in the state of Florida and has an office in Jacksonville, Florida.

4. This action involves a marine contract for the carriage of goods upon navigable waters.

## COUNT I - BREACH OF CONTRACT

5. Plaintiff realleges and incorporates paragraphs 1 through 4 as if set out herein in full.

6. On or about September 18, 1995, pursuant to the bill of lading hereto and fully incorporated herein as Exhibit "A," 320 55 gallon drums of turpentine were shipped from Fuzhou, Fujian, China to Houston, Texas.

7. On or about September 18, 1995, pursuant to the bill of lading hereto and fully incorporated herein as Exhibit "B," 240 55 gallon drums of turpentine were shipped from Fuzhou, Fujian, China to Houston, Texas.

8. The 55 gallon drums in the bills of lading were packaged into containers by the Shipper for shipment on board the M/V HUA HANG from Fuzhou, Fujian, China to San Pedro, California.

9. The 55 gallon drums were to be unloaded from the M/V HUA HANG in San Pedro, California for shipment by rail to the final place of delivery in Houston, Texas.

10. Upon inspection of the containers in San Pedro, California, the drums were found to be improperly packaged for shipment by rail to Houston, Texas.

11. Plaintiff, AMERICAN PRESIDENT LINES, incurred costs in the total amount of Five Thousand Eight Hundred Eleven Dollars and Eighty Cents, $5,811.80, in re-packing the drums for final shipment to Houston, Texas as evidence by attached invoices marked "C," "D" and "E."

12. Defendant, FLORACHEM CORPORATION, accepted delivery of the 55 gallon drums as consignee in Houston, Texas.

13. Defendant, FLORACHEM CORPORATION, is liable for the re-packing charges incurred by Plaintiff, AMERICAN PRESIDENT LINES, LTD., under the bills of lading as consignee of the goods carried by Plaintiff because the Defendant has accepted the goods shipped by the Plaintiff and the benefit of the re-packing charges incurred by the Plaintiff.

14. Plaintiff, AMERICAN PRESIDENT LINES, LTD., has suffered damages in the amount of Five Thousand Eight Hundred Eleven Dollars and Eighty Cents, $5,811.80, as a result of Defendant's, FLORACHEM CORPORATION's, failure to reimburse the Plaintiff for necessary re-packing of the 55 gallon drums.

## COUNT II - BREACH OF WARRANTY

15. Plaintiff realleges and incorporates paragraphs 1 through 4 as if set out herein in full.

16. On or about September 18, 1995, pursuant to the bill of lading hereto and fully incorporated herein as Exhibit "A," 320 55 gallon drums of turpentine were shipped from Fuzhou, Fujian, China to Houston, Texas.

17. On or about September 18, 1995, pursuant to the bill of lading hereto and fully incorporated herein as Exhibit "B," 240 55 gallon drums of turpentine were shipped from Fuzhou, Fujian, China to Houston, Texas.

18. The 55 gallon drums were packaged into containers for shipment on board the M/V HUA HANG for shipment from Fuzhou, Fujian, China to San Pedro, California.

19. The 55 gallon drums were to be unloaded from the M/V HUA HANG in San Pedro, California for shipment by rail to the final place of delivery in Houston, Texas.

20. That upon inspection of the containers in San Pedro, California, the drums were found to be improperly packaged for shipment by rail to Houston, Texas.

21. That Section 7 of the Bills of Lading provided that "The shipper and Consignee with respect to cargo units not packed or loaded by the Carrier, represent and warrant: (a) that the Goods are properly described, marked, secured, and packed in their respective cargo units: . . . ." See Exhibit "F."

22. The Defendant, FLORACHEM CORPORATION, breached its express warranty to properly pack the 55 gallon drums.

23. Plaintiff, AMERICAN PRESIDENT LINES, incurred costs in the total amount of Five Thousand Eight Hundred Eleven Dollars and Eighty Cents, $5,811.80, in re-packing the drums for final shipment to Houston, Texas as evidence by attached invoices marked "C," "D" and "E."

WHEREFORE the Plaintiff, AMERICAN PRESIDENT LINES, LTD., demands judgment against the Defendant, FLORACHEM CORPORATION, in the amount of $5,811.80 plus interest, costs, attorneys fees and any further relief as this Court deems just and proper.

Andrew C. Eckhoff
FBN: 0162663
HAYDEN & MILLIKEN, P.A.
615 De Leon Street
Tampa, Florida 33606-2736
Telephone: (813) 251-1770
Facsimile: (813) 254-5436
Attorneys for Plaintiff

# AMERICAN PRESIDENT LINES, LTD. — BILL OF LADING

| Field | Value |
|---|---|
| SHIPPER | FUJIAN SINO CONSUMER PRODUCTS CO., LTD<br>NO.209 XING DONG YE RU<br>FUZHOU, FUJIAN, CHINA |
| BOOKING NUMBER | 023109758 |
| B/L NUMBER | APLU 023109758 |
| PAGE | 1 OF 1 |
| CONSIGNEE | TO THE ORDER OF FIRST UNION NATIONAL BANK OF FLORIDA |
| NOTIFY PARTY/INTERMEDIATE CONSIGNEE | FLORACHEM CORPORATION<br>P.O. BOX 5368<br>JACKSONVILLE, FL 32207<br>FAX: 904-399-5950 |
| POINT AND COUNTRY OF ORIGIN OF GOODS | FUZHOU, FJ, PRC |
| PLACE OF RECEIPT | FUZHOU, FJ, PRC |
| EXPORT CARRIER (Vessel, voyage, & flag) | HUA HANG 549 |
| PORT OF LOADING | FUZHOU, FJ, PRC |
| PORT OF DISCHARGE | SAN PEDRO, CA |
| PLACE OF DELIVERY | HOUSTON, TX |

## PARTICULARS FURNISHED BY SHIPPER

| MKS. & NOS./CONTAINER NOS. | NO. OF PKGS. | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| FLORA<br>HOUSTON<br>1-320 | 320 | DRMS  HTPC294000.0000  SLAC CY/CY<br>XTURPENTINE | 62880 KG<br>138627 LB | 54.960 M<br>1940.892 CF |

| **CTR NBR** | **SEAL NBR** | T/S | MODE | QUANT/TYPE | WEIGHT/UNIT |
|---|---|---|---|---|---|
| APLU275580 | CFFTC14331 | D20 | CY/CY | 80 CTNS | 34657LBS 15720KG |
| APLU290695-0 | CFFTC14334 | D20 | CY/CY | 80 DRMS | 34657LBS 15720KG |
| GSTU232400-4 | CFFTC14335 | D20 | CY/CY | 80 DRMS | 34657LBS 15720KG |
| TPHU616919-3 | CFFTC14333 | D20 | CY/CY | 80 DRMS | 34657LBS 15720KG |

SHIPPED ON BOARD SEP. 18, 1995

***** APL COPY *****
** NON-NEGOTIABLE **

| B/L TO BE RELEASED AT | FUZ | OCEAN FREIGHT PAYABLE AT | FUZHOU, FJ, PRC |
|---|---|---|---|

| FREIGHT RATES CHARGES, WEIGHTS AND/OR MEASUREMENTS | | PREPAID U.S. $ | COLLECT U.S. $ |
|---|---|---|---|
| A | 54.96m3  175/M3 | 9618.00 | |
| ODC | US$  485/VAN | | 1940.00 |
| F&F | US$  62/VAN | 248.00 | |

| Vessel | Voyage | Office | TOTAL PREPAID | FUZ | 9866.00 | |
|---|---|---|---|---|---|---|
| 956 | 549 | | TOTAL COLLECT | HOU | | 1940.00 |

| FCC | FORWARDER | SHIPPER | CONSIGNEE | LD. PORT | DIS. PORT | DEST. | NOTIFY | CSC | B/L NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| 000000 | 000000 | 000000 | FUZ | FE | HOU | | | 1 | APLU 023109758 |

Date and Place Issued: FUZHOU, FJ  SEP. 18, 1995

AMERICAN PRESIDENT LINES, Ltd

EXHIBIT A

*APPLICABLE ONLY WHEN USED AS MULTI MODAL BILL OF LADING.  D-15 B/L  20-00-160  7/92

# AMERICAN PRESIDENT LINES, LTD. BILL OF LADING

| SHIPPER | BOOKING NUMBER | B/L NUMBER |
|---|---|---|
| FUJIAN SINO CONSUMER PRODUCTS CO., LTD<br>NO. 209 XING DONG YE RU<br>FUZHOU, FUJIAN, CHINA | 023109757 | APLU 023109757<br>PAGE 1 OF |

EXPORT REFERENCES

| CONSIGNEE | FORWARDING AGENT |
|---|---|
| TO THE ORDER OF FIRST UNION<br>NATIONAL BANK OF FLORIDA | |

POINT AND COUNTRY OF ORIGIN OF GOODS: FUZHOU, FJ, PRC

| NOTIFY PARTY/INTERMEDIATE CONSIGNEE | ALSO NOTIFY / DOMESTIC ROUTING / EXPORT INSTRUCTIONS/PIER — TERMINAL/ONWARD ROUTING FROM POINT OF DESTINATION |
|---|---|
| FLORACHEM CORPORATION<br>P.O. BOX 5366<br>JACKSONVILLE, FL 32207<br>FAX: 904-399-5950 | |

| INITIAL CARRIAGE (MODE) | PLACE OF RECEIPT |
|---|---|
| | FUZHOU, FJ, PRC |
| EXPORT CARRIER (Vessel, voyage, & flag) | PORT OF LOADING |
| HUA HANG 549 | FUZHOU, FJ, PRC |
| PORT OF DISCHARGE | PLACE OF DELIVERY |
| SAN PEDRO, CA | HOUSTON, TX |

## PARTICULARS FURNISHED BY SHIPPER

| MKS. & NOS./CONTAINER NOS. | NO. OF PKGS. | H/M | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|---|
| FLORA<br>HOUSTON<br>1-240 | 240 | | DRMS A)PC294000.0000 SLAC CY/CY<br>XTURPENTINE | 47160 KG<br>103970 LB | 41.220 M3<br>1455.672 CF |

| **CTR NBR** | ****SEAL NBR**** | T/S | MODE | QUANT/TYPE | WEIGHT/UNIT | |
|---|---|---|---|---|---|---|
| APLS276740 | CFFTC14315 | D20 | CY/CY | 80 DRMS | 34657LBS | 15720KG |
| APLS293274-0 | CFFTC14336 | D20 | CY/CY | 80 DRMS | 34657LBS | 15720KG |
| GSTU219534-0 | CFFTC14332 | D20 | CY/CY | 80 DRMS | 34657LBS | 15720KG |

SHIPPED ON BOARD SEP. 18, 1995

***** APL COPY ****
** NON-NEGOTIABLE *

| B/L TO BE RELEASED AT | FUZ | OCEAN FREIGHT PAYABLE AT | FUZHOU, FJ, PRC | | |
|---|---|---|---|---|---|
| FREIGHT RATES CHARGES, WEIGHTS AND/OR MEASUREMENTS (SUBJECT TO CORRECTION) | | PREPAID U.S. $ | COLLECT U.S. $ | Local Currency |
| A | 41.22M3 | 175/M3 | 7213.50 | | |
| DDC | US$ | 485/VAN | | 1455.00 | |
| FAF | US$ | 62/VAN | 186.00 | | |

EXHIBIT B

AMERICAN PRESIDENT LINES, Ltd.

By: Authorized Rep. of Carrier or Master
Date and Place Issued: SEP. 18, 1995 FUZHOU, FJ

| | | | TOTAL PREPAID | FUZ | 7399.50 | | | |
|---|---|---|---|---|---|---|---|---|
| Vessel | Voyage | Office | TOTAL COLLECT | HOU | | 1455.00 | | |
| | | | | FUZ | SPE | HOU | | T APLU 023109757 |
| FCC | FORWARDER | SHIPPER | CONSIGNEE | LD. PORT | DIS. PORT | DEST. | NOTIFY | CSC B/L NUMBER |

APPLICABLE ONLY WHEN USED AS MULTI MODAL BILL OF LADING.  D-15 B/L  20-00-160  7/92

# AMERICAN PRESIDENT LINES, LTD.
Part of the American President Companies group.

## INVOICE

No. SPEI034613

Please reference this invoice number on your payment.

| BL23109757 | US | BLOCK AND BRACE CHARGES | 11/08/95 | 1 |

**To:** FLORACHEM CORPORATION
P.O. BOX 5346
JACKSONVILLE     FL     32207

**Attn:** ACCTS PAYABLE

Make checks payable and remit to:
AMERICAN PRESIDENT LINES LTD
ADMINISTRATION BUILDING
2001 JOHN GIBSON BLVD
SAN PEDRO          CA 90731

| Description Of Charges | Unit Count | Unit Price | Amount |
|---|---|---|---|
| PRES FRM V/77 B/L 23109757 APL5293956 -BLOCKED AND BRACED FOR RAIL MOVEMENT (SEE ATTACHED) | | | 652.10 |

**INVOICE TOTAL** $ 652.10

---

Please detach this portion and return with payment.

# AMERICAN PRESIDENT LINES, LTD.
Part of the American President Companies group.

No. SPEI034613

| Customer | | | | |
| SPEFLORACH | FLORACHEM CORPORATION | RTCC | 11/08/95 | 652.10 |

Make checks payable and remit to:

AMERICAN PRESIDENT LINES LTD
ADMINISTRATION BUILDING
2001 JOHN GIBSON BLVD
SAN PEDRO          CA 90731



EXHIBIT C

**Payment Stub**

# AMERICAN PRESIDENT LINES, LTD.
Part of the American President Companies group.

# INVOICE

No. SPEI034533

Please reference this invoice number on your payment.

| Reference Number | Currency | Invoice Description | Invoice Date | Page |
|---|---|---|---|---|
| BL23109757 | US $ | BLOCK AND BRACE CHARGES | 07/05/95 | 1 |

To: FLORACHEM CORPORATION
P.O. BOX 5366
JACKSONVILLE   FL   32207

Attn: ACCTS PAYABLE

Make checks payable and remit to:
AMERICAN PRESIDENT LINES LTD
ADMINISTRATION BUILDING
2001 JOHN GIBSON BLVD
SAN PEDRO            CA 90731

| Description Of Charges | Unit Count | Unit Price | Amount |
|---|---|---|---|
| B/L 023109757  APLS293274<br>RE-BLOCKED AND BRACED FOR RAIL<br>MOVEMENT  SEE ATTACHED | | | 737.10 |
| B/L 023109757  APLS276740<br>RE-BLOCKED AND BRACED FOR RAIL<br>MOVEMENT  SEE ATTACHED | | | 737.10 |
| B/L 023109757  GSTU219534<br>RE-BLOCKED AND BRACED FOR RAIL<br>MOVEMENT  SEE ATTACHED | | | 737.10 |

INVOICE TOTAL  $  2,211.30

Please detach this portion and return with payment.

# AMERICAN PRESIDENT LINES, LTD.
Part of the American President Companies group.

No. SPEI034533

| Customer No. | Consignee Name | Res. Type | Invoice Date | Amount Due |
|---|---|---|---|---|
| SPCFLORACH | FLORACHEM CORPORATION | RTCC | 07/05/95 | 2,211.30 |

Make checks payable and remit to:
AMERICAN PRESIDENT LINES LTD
ADMINISTRATION BUILDING
2001 JOHN GIBSON BLVD
SAN PEDRO            CA 90731

EXHIBIT D

Payment Stub

# AMERICAN PRESIDENT LINES, LTD.
Part of the American President Companies group.

**INVOICE**   No. SPEI034532

Please reference this invoice number on your payment.

BL23109758 | US$ | BLOCK AND BRACE CHARGE | 10/25/95

To: FLORACHEM CORPORATION
P.O. BOX 5366
JACKSONVILLE     FL    32207

Make checks payable and remit to:
AMERICAN PRESIDENT LINES LTD
ADMINISTRATION BUILDING
2001 JOHN GIBSON BLVD
SAN PEDRO          CA 90731

Attn: ACCTS PAYABLE

| Description Of Charges | Unit Count | Unit Price | Amount |
|---|---|---|---|
| B/L 023109758 GSTU232400 RE-BLOCKED AND BRACED FOR RAIL MOVEMENT SEE ATTACHED | | | 737.10 |
| B/L 023109758 APL9075889 RE-BLOCKED AND BRACED FOR RAIL MOVEMENT SEE ATTACHED | | | 737.10 |
| B/L 023109758 TPHU616019 RE-BLOCKED AND BRACED FOR RAIL MOVEMENT SEE ATTACHED | | | 737.10 |
| B/L 023109758 APL9290695 RE-BLOCKED AND BRACED FOR RAIL MOVEMENT SEE ATTACHED | | | 737.10 |

INVOICE TOTAL $ 2,948.40

*Please detach this portion and return with payment.*

## AMERICAN PRESIDENT LINES, LTD.
Part of the American President Companies group.

No. SPEI034532

SPE CORACH | FLORACHEM CORPORATION | RTCC | 10/25/95 | 2,948.40

Make checks payable and remit to:
AMERICAN PRESIDENT LINES LTD
ADMINISTRATION BUILDING
2001 JOHN GIBSON BLVD
SAN PEDRO          CA 90731


EXHIBIT E

**Payment Stub**

**1. DEFINITIONS** The word "Carrier" shall include American President Lines, Ltd.; the owner, operator, charterer and master of the Vessel, the Vessel, and any connecting or substituted water carrier performing transportation under the transportation agreement evidenced by this bill of lading. The word "Vessel" shall include the vessel named on the face of this bill of lading and any other vessel, lighter or watercraft owned, operated or chartered by the Carrier or any connecting or substituted water carrier performing transportation under the transportation agreement. The word "Shipper" shall include the person entering into the transportation agreement with the Carrier and for whose account the Goods are shipped. The word "Goods" shall include articles of every kind and description, including their packaging, containers or other shipping units or materials, tendered to the Carrier for transportation under the transportation agreement and described or identified on the face of this bill of lading. The word "Consignee" shall include a holder of a negotiable bill of lading, rightfully endorsed, the person named as consignee on the face hereof, the owner of the Goods, and all other persons lawfully entitled to possession of the Goods (other than the Carrier). The word "charges" shall include freight, demurrage, equipment detention, general average and any other money obligations incurred and payable by the Shipper and the Consignee or either of them, or for the payment of which the Carrier has a security interest or maritime lien on the Goods under the transportation agreement or by operation of law. The phrase "Joint Service Connecting Carrier" shall include any non-vessel operating common carrier by rail, truck or air with whom American President Lines, Ltd. participates in any joint service under a through bill of lading in accordance with any applicable joint freight tariff. An endorsement that the Goods have been shipped "on board" means on board the carrier's vessel, or another mode of transport operated by or on behalf of carrier or a Joint Service Connecting Carrier and enroute to the port of loading for loading aboard Carrier's vessel.

**2. CLAUSE PARAMOUNT.** The receipt, custody, carriage and delivery of the Goods are governed by the provisions of the transportation agreement evidenced hereby and incorporated by this reference, including (i) the terms and conditions of the Carrier's applicable freight tariffs (ii) the terms and conditions stated on the front and back of this bill of lading, and (iii) the provisions of the U.S. Carriage of Goods by Sea Act, 1936, ("COGSA") or the Hague Rules of 1921, as amended by the Brussels Convention of 1924, in effect in the country in which a court having jurisdiction adjudicates a dispute arising out of the transportation agreement. Such Act and Rules shall be extended to apply to Goods stowed on deck as provided in paragraph 8, before the Goods are loaded on and after they are discharged from the Vessel, and throughout the entire time during which the Carrier is responsible for the Goods under the transportation agreement. To the extent required by United States law, copies of the Carrier's tariffs are filed at the Federal Maritime Commission, Washington, D.C., U.S.A., and, the Interstate Commerce Commission, Washington, D.C. and are readily available to the public and can be conveniently inspected at each of the Carrier's offices and terminals where Goods are received for transportation and delivered after transportation. The provisions of Carrier's applicable tariffs, this bill of lading and said COGSA or Hague Rules shall govern the relationships between the Shipper, Consignee and every person having an interest in the Goods on the one hand, and the Carrier on the other, in every contingency whatsoever, and shall supersede any prior booking arrangement, mate's or dock receipt, or other arrangement to the extent conflicting. The terms and conditions of this bill of lading and the instruments incorporated herein by reference shall be severable. If any provision is invalid or unenforceable, and if any breach of or deviation from any provision occurs, such circumstance shall not affect the validity or enforceability of the remaining provisions.

**3. FREIGHT.** Freight, demurrage, container equipment detention and other charges shall be due and payable to the Carrier in accordance with the provisions of the Carrier's applicable tariffs and this bill of lading. Freight may be calculated on the basis of information concerning the Goods furnished by the Shipper, but the Carrier may open containers, packages or other shipping units and examine, weigh, measure and identify the true nature and quantity of the Goods. If Shipper-furnished information is determined to be erroneous and additional freight and other charges are payable, the Shipper, Consignee and the Goods shall be liable therefor and for any expense incurred by the Carrier in examining, weighing and measuring the Goods. Full freight to the port or point of delivery under the transportation agreement shall be completely earned upon receipt of the Goods by the Carrier, whether or not the freight is stated on the front side hereof or intended to be prepaid or collected at destination and whether or not the Goods are damaged or sound, and shall be received and retained irrevocably under all circumstances whatsoever, Vessel and/or the Goods lost or not lost or the voyage broken up or abandoned. The Carrier shall have a lien on the Goods, which shall survive delivery, for freight, demurrage, and all other charges earned or due under the transportation agreement or by operation of law and may enforce this lien by public or private sale and without notice. The Shipper and the Consignee shall be jointly and severally liable to the Carrier for the payment of freight and other charges and for any expenses, including attorney's fees, in connection with claims or legal proceedings brought by third parties claiming to have or having the right to possess the goods. The Shipper and the Consignee shall be bound by all the provisions of the transportation agreement unless otherwise expressly provided in the Carrier's applicable tariffs. All freight and other charges shall be paid to the Carrier in full without offset, counterclaim or deduction, in the currency specified in the Carrier's applicable tariff, or, if no currency is so specified, in the lawful currency of the United States or, at Carrier's option, an equivalent sum in the currency of the place of payment determined at the New York exchange demand rate in effect at the time the Goods are delivered, for distribution by Carrier to itself and to any joint service carrier performing transportation services under a joint through bill of lading, as their respective interest may appear.

**4. AGREED VALUE; LIMITATION ON CARRIER'S LIABILITY.** To secure a due proportion between the amount for which it may be responsible in the event of loss or damage to the Goods, and the freight which it receives, the Carrier has established by its tariffs and offered the Shipper alternative rates of freight, namely, (1) its regular (lower) rates for goods limited in value as hereinafter agreed and (2) ad valorem rates for goods not so limited. Unless the Shipper shall cause the value of the Goods to be declared before shipment and elect to pay freight at the ad valorem rate, Shipper elects to ship under the regular (lower) rate and agrees that for the purpose of computing any liability of the Carrier for loss or damage, the value of the Goods shall be their market value at destination which shall be presumed to be invoice cost plus freight and insurance (or, where there is no invoice, the value of the Goods at the time and place of shipment plus freight and insurance) not in any event exceeding $500 per package lawful money of the United States, or in case of Goods not shipped in packages, $500 per customary freight unit, provided, however, that the Carrier's liability for injury to or death of live animals, birds, reptiles and fish shall not exceed any special limitations set forth in the Carrier's tariff, unless in all cases the above provisions for placing a higher valuation thereon have been complied with. In no event shall the Carrier be liable for more than the amount of damage actually sustained, nor shall the Carrier be liable for loss of or damage to any Goods not identified in the transportation documents furnished to the Carrier.

**5. JOINT SERVICE CARRIAGE.** Shipments of Goods under joint rates and through routes in which Carrier and one or more Joint Service Connecting Carrier participate under applicable joint freight service tariffs shall be subject to the provisions of this paragraph. The care, custody, and carriage of the Goods during any period in which a Joint Service Connecting Carrier or its contractor or agent is in possession of the Goods shall be the sole responsibility of the Joint Service Connecting Carrier. If a Joint Service Connecting Carrier is a common carrier by rail or motor vehicle within the United States of America, the care, custody, and carriage of the Goods are subject to the terms and conditions of the Uniform Domestic Bill of lading or any bill of lading or circular exempt from regulation by the Interstate Commerce Commission issued or adopted by the Joint Service Connecting Carrier, to the extent provided in a Joint Service tariff, or applicable by force of law or regulation. If a Joint Service Connecting Carrier is an air carrier, the care, custody and carriage of the Goods are subject to the Convention for the Unification of Certain Rules relating to International Carriage by Air, signed at Warsaw, October 12, 1929 and to the air carrier's regular form waybill or other document evidencing the terms and conditions governing the air carrier's performance to the extent set forth in or incorporated by reference in an applicable freight tariff. If loss or damage occurs after receipt of the Goods as acknowledged by this bill of lading, the liability therefor, if any, shall be that of the Carrier to the extent caused by the Carrier and shall be that of a Joint Service Connecting Carrier to the extent caused by such connecting carrier, provided however, if it cannot be determined in which carrier's custody the Goods were when lost or damaged the loss or damage shall be deemed to have occurred while the Goods were in the care and custody of the Carrier. Carrier extends the following offer with respect to only those Goods which are shipped from or consigned to locations within the United States, its territories or possessions and Canada.

At the option of Shipper or Consignee, Carrier shall adjust claims for loss or damage to the Goods occurring while in the care and custody of a Joint Service Connecting Carrier on behalf of the claimant without charge. Carrier also offers to loan the claimant the value of its claim against the Joint Service Connecting Carrier, as estimated by Carrier, secured by assignment of the claim to Carrier and by Carrier's name in the amount of the loan, with recourse limited to the security; provided however, that Carrier's offer to loan shall be limited to $500 per package, or in the case of Goods not shipped in packages, per customary freight unit, for each such package or unit lost or damaged. Carrier's offer to loan shall be conditioned upon claimant's acceptance and furnishing to Carrier of a complete and enforceable claim including supporting documentation, not later than 90 days prior to the expiration of any period of limitation applicable to the filing of claims or the commencement of suits against the Joint Service Connecting Carrier.

**6. CARRIER'S CONTRACTORS.** If Carrier requires the assistance of others to perform the services undertaken under the transportation agreement evidenced by this bill of lading as well as transportation agreements between Carrier and others, every servant, agent, stevedore, terminal services contractor, lighter operator, pilot or other independent contractor, including their servants, agents and subcontractors, performing such services shall have the benefit of every exemption from and limitation of liability, defense, right and immunity to which the Carrier is entitled. For purposes of the foregoing provision the Carrier shall be deemed to be the agent or trustee for the benefit of all such persons and all such persons shall be deemed to be parties to the agreement evidenced hereby to that extent.

**7. SHIPPER'S WEIGHT, LOAD AND COUNT; SHIPPER'S WARRANTIES.** When containers, vans, trailers, portable tanks, skids, palletized units, and other cargo units are not packed or loaded by the Carrier, the Carrier does not represent to be accurate and is not bound by any description of the value, quantity, weight, condition, or existence of the contents thereof as furnished by or on behalf of Shipper or identified in this bill of lading by use of the phrase "said to contain" or otherwise, and shall not be liable for any difference in value, quantity, weight or condition of the Goods furnished by or on behalf of the Shipper and that of the Goods actually delivered. The Carrier shall have no responsibility or liability whatever for the packing, loading, securing, shoring and/or stowage of contents of such cargo units, or for loss or damage caused thereby or resulting therefrom. The Shipper warrants that it or its authorized representative has inspected such cargo units before loading and that they are physically suitable to properly contain their contents.

The Shipper and Consignee, with respect to cargo units not packed or loaded by Carrier, represent and warrant: (a) that the Goods are properly described, marked, secured, and packed in their respective cargo units; (b) that any cargo units other than Carrier-furnished units are physically suitable, sound and structurally adequate properly to contain and support the Goods during handling and on the voyage, and that such cargo units may be handled in the usual and customary manner without damage to themselves or to their contents, or to the Vessel or its other cargo, or property, or persons; (c) that all particulars with regard to the cargo units and their contents and the weight of each said cargo unit, are in all respects correct, and (d) that such units are in compliance with all applicable government regulations. Shipper and Consignee, jointly and severally, agree to indemnify Carrier and to hold it harmless in respect of any injury or death of any person, or any loss or damage to cargo or any other property or to the Vessel or any other vessel, or any expense, including attorneys fees, caused by breach of any of the foregoing representations or warranties.

**8. UNDER DECK AND ON DECK STOWAGE.** The Carrier has the right to carry Goods in containers, vans, trailers, and portable tanks under deck or on deck. When such Goods are carried on deck, the Carrier shall not be required to specially note, mark or stamp any statements of "on deck" carriage on the face of this bill of lading nor to give notice thereof to the Shipper or Consignee. In respect of Goods in containers, vans, trailers, or portable tanks carried on deck, the Carrier shall not be liable for loss or damage caused by perils inherent in or incident to such carriage ...

In respect of Goods not in containers, vans, trailers or tanks carried on deck ... transportation agreement, the Carrier shall so state such carriage on the front side hereof and all risk of loss ... deterioration and other perils inherent in such carriage shall be borne by the Goods and anyone having an interest ...

**9. SPECIAL STOWAGE; REFRIGERATION.** Goods will not be ... refrigerated, insulated or naturally ventilated stowage unless the Carrier has undertaken such special stowage in advance of the Carrier's receipt of the Goods, and in the absence of such agreement the Shipper ... does not require such protection. The Carrier does not provide mechanically ... maintain preservative gases in connection with temperature controlled stowage ... for loss or damage to Goods arising in whole or in part from any lack of such ... to the Goods arising from latent defects, breakdown ... any apparatus of the ...

the transport, have exercised ... into a refrigerated container ... and set the thermostatic c... arising out of or resulting fro... container, and a temperature ... representative, Carrier will ... containers, where Carrier has ... range, the Carrier undertake ... the equipment and makes ... vegetable, meat, fish, or any ...

**10. RECONDITIONING, E...** Goods for the safety of pers... law, Carrier shall be reimbur... or, if no such rates apply, at ...

**11. TRANSSHIPMENT; SU...** the Vessel does not dischar... after loading at the original ... or the route to or beyond it... carrier's vessel or other mea...

**12. SCHEDULE; DELAY.** ... of receiving or loading or w... or other conveyance at any ... Scheduled or advertised dep... or any Joint Service Connec... liable for consequential or se... transporting the Goods.

**13. SCOPE OF VOYAGE;** ... may provide substituted serv... routes or ports, may include ... tugs or pilots, undertake ... which, in the opinion of the ... advantage to the Vessel or ... unlawful or commercially ... port of discharge, the Master ... by the Carrier to be safe or ... water, motor vehicle or air, ... The exercise of any of the ... portation agreement and not ... and delivered to a forwarding ... or when required to be deliver... complete delivery and perfor...

**14. DELIVERY UNDER NE...** Goods shall be delivered at ... however, if the Goods are to ... stated on the face hereof, C... for such beyond carriage co... either of them, at the risk ... carrier without surrender of ... connecting carrier's acknowle... properly endorsed bill of ladin...

**15. UNDELIVERED GOODS** ... upon their arrival and availab... as set forth in a notice of arr... and in addition to any other le... sale of the Goods, or may pl... the Carrier for any charges d...

**16. CARRIER'S CONTAINE...** of them, shall take possessio... Consignee in possession, or ... and hold harmless the Carrie... injury to or death of persons ...

**17. DANGEROUS, HAZARD...** hazardous, unstable or dange... character, may at any time b... without liability on the part of ... may, without incurring any lia... or become dangerous or no... losses, damages, liabilities, ... in whole or in part by omissi...

**18. CONDITION OF IRON ...** of lading with reference to sc... rust or moisture. If the Shipp... which may exist at the time ...

**19. MARKS.** The Goods sh... except for Goods shipped in ...

**20. GENERAL AVERAGE.** ... 1974, except Rule XXII there... matters not provided for by ... Rules, expenditures and/or s... allowable under Rules X, XI ... in Rule A. In connection with ... of the United States at the ... foreign currency shall be con... of such damaged cargo from ... the Carrier must be furnishe... additional security for the ... prejudice to the ultimate liabi... delivery. Such deposits shall ... to the adjuster. When so rem... the adjuster pending settlem... of the United States in the ... resulting from any cause wh... Carrier is not responsible to ... Shipper and Consignee shall ... expenses of a general averag... incurred in respect of the Go... the Goods, salvage shall be p...

**21. BOTH TO BLAME COL...** of the negligence of the othe... navigation or management of ... indemnify the Carrier against ... by the other or non-carrying ve... from the Vessel or the Carrier ... operators or other persons ... objects are at fault in respect ...

**22. LOSS OR DAMAGE BY ...** time, even though before loadi... such fire shall be caused by th...

**23. WAR RISKS; GOVERNM...** to be contraband and persons ... to sail armed or unarmed and ... departure, arrival, routes, port... government of any nation or ... government of or ...

EXHIBIT

provided for in the terms and ... above. Such terms and conditio... must be commenced, which ar... under the Uniform Domestic Bil... after delivery of import traffic ...

**25. HEADINGS.** The heading... shall not be considered ...

the transport, have exercised due diligence to maintain such equipment in an efficient state [illegible] Goods have been packed into a refrigerated container by or on behalf of the Shipper, it is the obligation of the Shipper to stow the contents properly and set the thermostatic controls exactly, and the Carrier shall not be liable for any loss of or damage to the Goods arising out of or resulting from the Shipper's failure in such obligations. If the Carrier has packed the Goods into a refrigerated container, and a temperature or temperature range has been disclosed to the Carrier by the Shipper or its authorized representative, Carrier will set the thermostatic control accordingly. With respect to both Carrier and Shipper packed containers, where Carrier has undertaken, by special agreement, to carry the Goods at a particular temperature or temperature range, the Carrier undertakes only that the refrigeration equipment shall perform within the operating specifications of the equipment and makes no warranty or agreement with respect to the actual temperature of any commodity, fruit, vegetable, meat, fish, or any perishable Goods within the container [illegible]

**10. RECONDITIONING, ETC.** In the event that Carrier must perform reconditioning, cooperage or restowage of the Goods for the safety of persons or of the Goods or other property or to bring the Goods into conformance with applicable law, Carrier shall be reimbursed therefor at accessorial labor and equipment rental rates named in any applicable tariff or, if no such rates apply, at 120% of Carrier's costs of performing such work.

**11. TRANSSHIPMENT; SUBSTITUTION OF VESSEL.** Whether or not the Goods are consigned to a port or point where the Vessel does not discharge, the Carrier may without notice, tranship the whole or any part of the Goods before or after loading at the original port of shipment or any other place or places even though outside the scope of the voyage or the route to or beyond the port of discharge or the destination of the Goods, by any [illegible] or connecting [illegible] carrier's vessel or other means of transportation by water or by land or by air, whether operated by the Carrier or by others.

**12. SCHEDULE; DELAY.** The Carrier does not undertake that the Goods will be transported from or loaded at the place of receiving or loading or will arrive at the place of discharge, destination or transshipment aboard any particular vessel or other conveyance at any particular date or time or to meet any particular market or in time for any particular use. Scheduled or advertised departure and arrival times are only expected times and may be advanced or delayed if the Carrier or any Joint Service Connecting Carrier shall find it necessary, prudent or convenient. In no event shall the Carrier be liable for consequential or other damages for delay in the scheduled departures or arrivals of the vessel or other conveyance transporting the Goods.

**13. SCOPE OF VOYAGE; CARRIER'S LIBERTIES.** The voyage may call at scheduled ports in or out of the usual order, may provide substituted service by [illegible] other than water as may be provided for by applicable tariffs, may omit scheduled routes or ports, may include unscheduled routes or ports and may lighter the Goods. The Vessel may sail with or without tugs or pilots, undertake rescue or salvage, tow or be towed, or undergo drydocking or repairs. In any situation whatsoever which, in the opinion of the Master or the Carrier, gives rise to risk of seizure, detention, damage, loss, delay or disadvantage to the Vessel or the Goods or of materially detaining the equipment of the Carrier or would make it unprudent, unlawful or commercially impractical to commence or continue the voyage or to enter or discharge the Goods at the port of discharge, the Master or the Carrier may discharge the Goods, or any part of them, at any port or place considered by the Carrier to be safe or advisable under the circumstances and forward or arrange to forward the Goods by rail, water, motor vehicle or air, or place the Goods in a storage facility or warehouse at the risk and expense of the Goods. The exercise of any of the foregoing liberties by the Carrier or the Master shall constitute performance under the [illegible] portation agreement and not a deviation from the scope of the voyage. When the Goods are discharged from the Vessel and delivered to a forwarding agent or carrier or to a warehouse or storage facility under the provisions of this paragraph, or when required to be delivered to local customs authorities under local law, such discharge and delivery shall constitute complete delivery and performance under the transportation agreement.

**14. DELIVERY UNDER NEGOTIABLE BILLS OF LADING.** If the Goods are consigned "to order" on the face hereof the Goods shall be delivered at the place of delivery upon surrender of the original, properly endorsed bill of lading, provided however, if the Goods are to be transshipped via a connecting carrier to a destination or point beyond the place of delivery stated on the face hereof, Carrier may, on behalf of the Shipper and Consignee and acting solely as their agent, arrange for such beyond carriage consistent with instructions received from the Shipper or Consignee, or the representative of either of them, at the risk and expense of the Goods. In such event the Carrier may deliver the Goods to the connecting carrier without surrender of the original properly endorsed bill of lading, unless instructed otherwise, and shall obtain the connecting carrier's acknowledgement that delivery of the Goods shall be made only upon surrender of the Carrier's original properly endorsed bill of lading.

**15. UNDELIVERED GOODS.** If for any reason whatsoever, the Consignee refuses or fails to take delivery of the Goods upon their arrival and availability at destination and upon expiration of tariff prescribed free time and any notice period as set forth in a notice of arrival, availability, or [illegible] given by the Carrier, the Carrier may, without further notice or demand, and in addition to any other legal or equitable remedies, exercise its maritime lien for any charges due at a private or judicial sale of the Goods, or may place the Goods in storage at the risk and expense of the Goods, subject to a lien in favor of the Carrier for any charges due.

**16. CARRIER'S CONTAINERS.** Whenever a Shipper or Consignee or an agent or [illegible] acting on behalf of either of them, shall take possession of Carrier's container equipment [illegible] Consignee in possession or for the benefit of whom an agent or contractor [illegible] and hold harmless the Carrier from and against any loss or damage to Carrier's equipment and third party property and injury to or death of persons arising out of the use of said equipment.

**17. DANGEROUS, HAZARDOUS OR NOXIOUS CARGO.** [illegible] hazardous, unstable or dangerous nature shipped without full disclosure in writing to the Carrier as to their nature and character, may at any time before discharge be landed at any place [illegible] destroyed or rendered innocuous without liability on the part of the Carrier [illegible] may, without incurring any liability, [illegible] or become dangerous or noxious to the Vessel or Cargo or to persons. The Shipper shall indemnify the Carrier for all losses, damages, liabilities, fines, civil penalties and expenses [illegible] in whole or in part by omission of full disclosure required by this paragraph [illegible] regulations.

**18. CONDITION OF IRON, STEEL AND METAL PRODUCTS.** The term "apparent good order" when used in this bill of lading with reference to iron, steel or metal products [illegible] [illegible] which may exist at the time [illegible]

**19. MARKS.** The Goods shall be [illegible] except for Goods shipped in bulk or as otherwise [illegible] Carrier tariff.

**20. GENERAL AVERAGE.** General average shall [illegible] 1974, except Rule XXII thereof [illegible] United States as may be selected by the Carrier, and as to matters not provided for by these [illegible] of San Francisco. In applying these Rules, expenditures [illegible] of the voyage and which are otherwise allowable under Rules X, XI, XII, XIV or XV [illegible] in Rule A. In connection with [illegible] of the United States at the rate prevailing [illegible] foreign currency shall be converted at the rate [illegible] damage to cargo claimed in of such damaged cargo from the ship [illegible] the Carrier must be furnished before delivery of the Goods [illegible] additional security for the contribution of the Goods [illegible] prejudice to the ultimate liability of the parties [illegible] delivery. Such deposits shall at the option of the Carrier [illegible] of the United States and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment [illegible] the adjuster pending settlement of the general average and refunds or credit balances, if any [illegible] of the United States. In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Carrier is not responsible to the Goods, the Shipper or the Consignee by statute, contract or otherwise, the Goods, the Shipper and Consignee shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage [illegible] incurred in respect of the Goods. If a salving ship is owned or operated by the Carrier [illegible] the Goods, salvage shall be paid as fully as if such salving ship belonged to strangers.

**21. BOTH TO BLAME COLLISION CLAUSE.** If the Vessel comes into collision with another vessel as the joint result of the negligence of the other vessel and any act, neglect or default of the master [illegible] in the navigation or management of the Vessel, the Shipper or Consignee having beneficial ownership of the Goods shall indemnify the Carrier against all loss or damage to or any claim whatsoever of said owner of the Goods paid or payable by the other or non-carrying vessel or her owners to said owner of the Goods and set off against, or recouped or recovered from the Vessel or the Carrier by the other vessel or its owners. The foregoing provisions shall also apply where the owners, operators or other persons in charge of any vessel or object other than, or in addition to, the colliding vessels are at fault in respect of a collision, allision, stranding or other accident.

**22. LOSS OR DAMAGE BY FIRE.** The Carrier shall not be liable for any loss or damage to the Goods occurring at any time, even though before loading on or after discharge from the vessel [illegible] such fire shall be caused by the design or neglect of American President Lines [illegible]

**23. WAR RISKS; GOVERNMENTAL ORDERS.** The Carrier shall have liberty [illegible] to be contraband and persons belonging to or intending to join the armed forces [illegible] to sail armed or unarmed and with or without convoy and to comply with any orders, requests or directions as to loading, departure, arrival, routes, ports of call, stoppage, discharge, destination, delivery or otherwise howsoever given by the government of any nation or department thereof or any person acting or purporting to act with the authority of such government or of any department thereof, or by any committee or person having under the terms of the war risk insurance on the Vessel, the right to give such orders, requests or directions. Delivery or other disposition of the Goods in accordance with such orders, requests or directions shall constitute performance of the Carrier's delivery obligations under this transportation agreement, and all responsibility of the Carrier whatsoever shall terminate upon such delivery or other disposition.

**24. TIME FOR SUIT.** The Carrier and the Vessel shall be discharged from all liability in contract and in tort in respect of loss, damage, delay, misdelivery or conversion unless suit is brought within [illegible] date when the Goods should have been delivered [illegible] or its attorneys or representatives shall not be [illegible] A claim against a Joint Service Connecting Carrier is subject to the claims filing, notice and time for suit requirements provided for in the terms and conditions governing that connecting carrier's performance [illegible] above. Such terms and conditions may prescribe periods within which notice must be given, claims must be filed, or suits must be commenced, which are either longer or shorter than that which governs claims against the Carrier. In particular, under the Uniform Domestic Bill of Lading applicable to rail movements, claims must be filed in writing within nine months after delivery of import traffic, or within nine months after delivery at the port of export for export traffic.

**25. HEADINGS.** The headings set out at the beginning of numbered paragraphs are for convenience of reference and shall not be considered in the interpretation [illegible]